**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BILL SALTER ADVERTISING, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 07-0081-WS-B** |
| ) | |
| **CITY OF BREWTON, ALABAMA,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on Defendant City of Brewton's Motion for Summary Judgment (doc. 52), Plaintiff's Motion for Partial Summary Judgment (doc. 55), and defendant's Motion to Substitute Exhibit (doc. 65). The Motions are now ripe for disposition.[1]

**I.     Factual Background.[2]**

Review of the record in this case is complicated by the extraordinary number of factual disagreements highlighted in the parties' briefs, and the proliferation of declarations and counter-declarations signed by key witnesses on either side to rebut each other's statements. At times, the parties' briefs convey the impression that they do not agree on any material facts, which in turn raises the question of how meritorious cross-motions for summary judgment could possibly emerge from such a simmering cauldron of hotly contested facts. As such, it is necessary to

---

[1]     Both sides, and defendant in particular, have attempted to circumvent the briefing page limits specified by Local Rule 7.1(b) by employing a tiny font for footnote text that appears considerably smaller than the 12-point typeface required by Local Rule 5.1(a) for non-proportionally spaced matter. Shrinking footnote typefaces to squeeze one's brief into the mandatory page limits and shifting content from one's brief to the proposed order or proposed findings of fact and conclusions of law (as plaintiff did) are improper stratagems for complying with the Local Rules and may result in nonconforming briefs being stricken.

[2]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). For that reason, with respect to each respective motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in that party's favor.

parse the record with extreme caution to identify what limited undisputed facts may exist, as well as to delineate the conflicting evidence as to numerous factual issues to assess whether summary judgment might be appropriate for either party on any legal issue.[3]

> **A.**     ***Salter's Business Dealings in Brewton.***

Plaintiff Bill Salter Advertising, Inc. ("Salter") is a Florida company that has been in the business of erecting and operating advertising signs for more than 50 years. (Crawley Decl. (doc. 57, Exh. A), ¶ 4.) At present, Salter owns and operates approximately 1,200 advertising displays throughout southern Alabama and northwestern Florida. (*Id.*; Salter Dep. (doc. 54, Exh. 2), at 12.) Among these advertising structures are multiple billboards located in and around defendant, the City of Brewton, Alabama (the "City" or "Brewton"). As of February 2007, Salter operated 15 outdoor advertising signs in Brewton. (McCurdy Decl. (doc. 57, Exh. C), ¶ 12.) Salter's advertising displays are utilized by businesses, as well as by churches, community organizations, hospitals, schools, individuals and the like to post both commercial and noncommercial messages. (Crawley Decl., ¶ 5; McCurdy Decl., ¶ 4.) Notwithstanding the variety of its clientele, Salter is a for-profit company that is unquestionably "in the business to charge for outdoor advertising," although some signs are put up as donations or in the name of

---

[3]     Because of the piecemeal manner in which testimony has been taken and in which declarations have been given, the record is confounded by the existence of multiple depositions and/or multiple declarations for several witnesses. The resulting confusion creates challenges for the Court in locating record citations given by the parties, identifying the record basis for particular factual statements, and teasing the thrust of a witness's testimony from as many as five or six overlapping depositions and affidavits containing similar assertions of fact by that very witness that may include both redundancies as well as divergent representations based on the witness's memory on the particular date. For example, a Second Declaration of Mike Crawley includes among its averments that the sequence of events leading to Salter's rebuild applications filed in July 2006 "is discussed both in my February 23, 2007 Declaration, as well as my July 2, 2007 and October 8, 2007 deposition testimony." (Doc. 57, Exh. F, at ¶ 6.) Thus, one witness statement in the record unhelpfully directs the Court to three other sets of non-identical record testimony by that same witness to discern relevant facts as to a single point, forcing the Court to consult four sets of testimony to determine what just one witness has to say about that one narrow factual issue. Based on the extremely fragmented, incohesive and duplicative state of the record, as described above, it is a daunting task to piece together what each witness has said about relevant facts, much less to ascertain what facts are uncontroverted for summary judgment purposes. By structuring the record so inefficiently, the parties have needlessly complicated the Court's task in reviewing the summary judgment facts.

freedom of speech.  (Salter Dep., at 26; Crawley Dep. (doc. 54, Exh. 1), at 20.)  Signs advertising noncommercial speech have constituted less than half of Salter's operations in Brewton for at least the last several years, and Salter seeks to replace any noncommercial messages with paying advertisers as soon as possible.  (*Id.* at 47, 65.)  Salter does not make money from noncommercial signs.  (Salter Dep., at 26.)  That said, there is ambiguity in the record as to the meaning of the term "noncommercial," and it is clear that Salter does make a profit by selling advertising space to certain organizations such as churches, the Save a Life Foundation, the Florida lottery, and the Chamber of Commerce, all of whose messages might be considered noncommercial in nature.  (Crawley Dep., at 49-50, 66-68.)[4]

> **B.     *The Sign Ordinance.***

During all times material to these proceedings, the City has had in effect a municipal ordinance governing the location, size, setback, height, frequency, and other standards for outdoor advertising signs (the "Ordinance").  The Ordinance itself recites dates of 2000 and 2002, but the record reflects that the City originally adopted it in 1992.  (Doc. 54, Exh. 5 & Exh. 21, at 10.)  The constitutionality of this Ordinance, both on its face and as applied, lies at the heart of this lawsuit.[5]

The detailed, eight-page Ordinance has numerous provisions that would affect the operations of an outdoor advertiser such as Salter.  The Ordinance requires that signs cannot be

---

[4]       From the record and briefs, it is not clear what line of demarcation Salter would draw to distinguish between commercial and noncommercial advertisements.  It is clear, however, that Salter's view is that if a school or a church pays Salter to display an advertisement for that school or church's educational or religious programs, then Salter views that speech as "noncommercial."  Indeed, Salter boasts that it "has a track record of earning income from the display of noncommercial advertisements."  (Doc. 67, at 15.)  The pending motions do not squarely present the question of the proper definition of "noncommercial speech" for constitutional purposes as applied to Salter's billboard business; therefore, as that thorny question is ancillary to the issues presented on summary judgment, the Court will not decide it *sua sponte*.  *See generally Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 539, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring) ("If anything, our cases recognize the difficulty in making a determination that speech is either 'commercial' or 'noncommercial'.").

[5]       An accurate copy of the Ordinance is found at Exhibit 5 to the City's summary judgment submission (doc. 54).  *See* Yuhasz Aff. (doc. 54, Exh. 24), ¶ 2 (confirming that Exhibit 5 is a true and correct copy of the Ordinance).

built, altered or relocated until a permit is issued by the City building inspector.  (Ordinance, § 10.711.)  The permit process contemplated by the Ordinance involves the submission of "such drawings and specifications as may be necessary to fully advise and acquaint the building inspector with" the specifics of the sign, as well as "the wording of the sign or advertisement to be carried on the sign."  (*Id.*)  A central aspect of the Ordinance for purposes of this litigation is its blanket prohibition on new off-premises billboards.  In particular, § 10.775(7) of the Ordinance unequivocally provides that "No new off-premises signs or billboards will be permitted in any zone, nor shall a permit be issued for any permitted on-premises sign for any premises on which there exists a grandfathered off-premises sign or billboard unless the off-premises sign or billboard is first permanently removed."  *Id.*  Other potentially relevant regulatory provisions include a general size limitation of 75 square feet for signs (§ 10.718), a general restriction on the placement of outdoor advertising signs on any street or highway right-of-way (§ 10.713), and a requirement that signs "shall be harmonious with the environment and with the nature of our special local characteristics of site, aesthetic tradition, and development potential" (§ 10.717).

Of some importance to these proceedings, the Ordinance includes a "grandfather" clause, under which any nonconforming sign in existence on the date the Ordinance took effect could continue to exist, subject to the proviso that "[i]f any nonconforming sign is removed or destroyed or becomes fifty (50) percent or more structurally deteriorated as determined by the building inspector, then the replacement sign shall be in conformance with the requirements of this ordinance."  (Ordinance, § 10.721.)[6]

###   C.   *Hurricane Ivan and the Rebuilding Discussions from 2004 to 2006.*

In September 2004, a number of Salter's signs in Brewton were damaged when Hurricane Ivan slammed into the Alabama Gulf Coast.[7]  Photographs in the record (albeit

---

[6]   Elsewhere, the Ordinance reiterates this principle, stating that when "any existing off-premises sign or billboard is removed or destroyed, any replacement sign or billboard shall be in conformance with the provisions of this ordinance."  (*Id.*, § 10.775(7).)

[7]   Symptomatic of the parties' inability to agree as to even basic record facts, the number of damaged signs is disputed, with each party relying on admissions by the other to contest the other's position.  The City asserts that only four Salter signs in Brewton were

submitted in the form of poor-quality grainy photocopies of photographs whose images are partially indistinguishable) reveal that four signs were torn to the ground and sustained what appears to be significant structural damage. (Doc. 4, at Exh. 6.) Each of the signs was an old wooden structure whose existence in Brewton long predated the City's adoption of the Ordinance. (Crawley Decl. II (doc. 57, Exh. F), ¶ 3.) As such, these damaged signs had been subject to the Ordinance's grandfathering provisions and had not previously been required to comport with the Ordinance.

Subsequently (although the parties cannot agree as to when, exactly, or even in what year), a dispute arose between Salter and the City as to whether those signs were at least 50% structurally deteriorated (such that any effort to rebuild or replace them would be subject to the Ordinance) or whether they were less than 50% structurally deteriorated (such that rebuilt or repaired signs at those locations would remain outside the realm of the Ordinance). For its part, Salter determined that each of the four signs was less than 50% damaged, based on an analysis of the cost to rebuild the sign versus the total cost of constructing a new sign. (McCurdy Dep. (doc. 57, Exh. G), at 8.)[8] By contrast, Brewton's building inspector made a determination that all four

<hr />

knocked down or otherwise damaged. Both the Complaint and the testimony of a Salter representative support this view. (Complaint, ¶¶ 10-11; Crawley Decl., ¶ 6; Crawley Dep. II (doc. 54, Exh. 3), at 21.) Meanwhile, Salter dismisses the City's assertion as "incorrect" (even though it is based solely on statements by Salter) and instead cites the affidavit of a City official that some 16 Salter signs in the Brewton area were damaged by Hurricane Ivan. (Diurno Aff. (doc. 57, Exh. K), ¶ 2.) Even as it maligns the City's contention in briefing the City's Rule 56 motion that only four signs were damaged, Salter asserts in briefing its own summary judgment motion that "[f]our of the advertising signs that Salter owns in the City were damaged in September 2004 during Hurricane Ivan." (Doc. 56, ¶ 3; doc. 58, at 2.) It is troubling that Salter would criticize as incorrect this factual contention in the City's Rule 56 motion in an attempt to concoct issues of material fact, only to make that very same factual contention in Salter's own Rule 56 motion. Such calculated inconsistencies on trivial matters are both improper and pointless. The Court need not devote further time to this discrepancy, which is not material to the legal issues raised in the dueling summary judgment motions.

[8]      The actual calculation worksheets used by Salter, which are dated February 3, 2005 (almost five months after Ivan), reflect computations that the cost of rebuilding each of the four signs was, respectively, 42%, 26%, 48% and 33% of the cost of new signs. (Doc. 57, at Exh. H.) These calculations are suspect, however, because all four worksheets would have yielded computations in excess of the 50% threshold if the same hourly rate had been used for

signs had been damaged greater than 50% by the storm.  (D. King Aff. 11/13/07 (doc. 54, Exh. 25), ¶ 5.)  The record does not reveal the date on which the building inspector made such a determination.

Within two weeks after Hurricane Ivan, Salter's Sales Manager, Mike Crawley, contacted the City's then-Director of Community Development, Pete Diurno, to discuss rebuilding the damaged signs.  (Crawley Dep. II (doc. 57, Exh. I), at 53.)  The occurrence of these conversations is not in dispute.  (Diurno Dep. (doc. 57, Exh. J), at 65.)  However, the particulars of those discussions are hotly contested.  Salter's evidence is that Diurno rebuffed Crawley's inquiries about rebuilding the signs by stating that the City was "working on a new ordinance." (Crawley Dep. I, at 86-87.)  Furthermore, Salter claims, Diurno advised Crawley that "essentially there was no need to" file applications to rebuild the signs because "there was a moratorium" on billboard construction in Brewton.  (Crawley Dep. II, at 48.)[9]  Thus, Salter's

labor costs for rebuilding signs as was used for building new signs.  Without explanation, Salter estimated the labor costs for building new signage as being a fixed number of hours at $180/hour, while the labor costs for rebuilding existing signs as being the same number of hours at $44/hour.  It is unclear why the hourly labor rate for rebuilding signs would be less than a quarter of that for erecting a new sign even as the total number of hours of labor remained unchanged.  If those hourly rates were equalized, the cost of rebuilding each of the four signs would be well over 50% of their replacement cost.  Furthermore, Salter cites no authority to explain its belief that the 50% figure should be determined by reference to building costs, and the Ordinance provides that whether a sign is more than 50% structurally deteriorated is to be determined by the City building inspector, not the sign company.  (Ordinance, § 10.721.)

[9]      The excerpts from Crawley's second deposition do not specify when Diurno allegedly made such statements.  Based on Crawley's averments in his Second Declaration, however, a reasonable inference is that Diurno made such statements to Crawley within weeks after Hurricane Ivan.  (Crawley Decl. II, at ¶¶ 4-5.)  Finally, in a Third Declaration (his fifth set of testimony in this case altogether, and prepared midstream in the summary judgment process), Crawley states that Diurno told him "as early as a few weeks after the Hurricane in September 2004 that the current moratorium would prevent us from even submitting rebuild applications." (Crawley Decl. III (doc. 64, Exh. B), at ¶ 6.)  One is left to wonder why he did not make such a statement in his numerous prior sworn testimony and averments in this case.  The constantly evolving, moving-target nature of Crawley's testimony (scattered across a multiplicity of declarations and deposition excerpts) as cited by Salter has made it difficult to ascertain exactly what Crawley's version of the facts is, and has doubtless created considerable fodder for cross-examination at trial.

evidence is that as early as September 2004, the City informed Salter that it could not apply to rebuild the damaged signs at that time because (a) the City was working on a new sign ordinance, and (b) there was a City-wide moratorium on sign construction.

By contrast, the City says that the delay in Salter's efforts to rebuild the four signs from 2004 through 2006 stemmed not from a moratorium, but from a disagreement between the parties concerning whether the signs were destroyed more than 50% or less than 50%, such that the parties could not agree whether the rebuilt signs would be covered by the Ordinance.  Indeed, the City's evidence is that these discussions delayed Salter's rebuilding efforts because "there was a difference of opinion between the City and [Salter] regarding whether the rebuilt signs would be required to meet the requirements of the Sign Ordinance ..., since the signs had sustained more than 50% damage. ... It was [Salter]'s decision to debate the amount of damage sustained which resulted in the delay on the rebuild of these signs, along with the fact that [Salter] did not formally apply to rebuild the signs until July of 2006."  (King Aff. 11/13/07, at ¶¶ 4, 6.)  The City's evidence is that Salter knew that its rebuild applications must be submitted in writing in order to be considered, but that it simply failed to do so until nearly two years after the fact.  (McCurdy Dep. (doc. 54, Exh. 7), at 12.)  Thus, the City has proffered evidence that the delays in Salter's receiving permission to rebuild their signs in Brewton after Hurricane Ivan were attributable to both a Salter-initiated debate about the degree of damage to the signs and Salter's dilatoriness in submitting the necessary paperwork.

Each party offers considerable record evidence to discredit the other side's account of the discussions between September 2004 and July 2006.  With respect to the moratorium, the City's evidence is that the moratorium was short-lived, being in place for just 90 days beginning June 28, 2005, such that it could not have been the driving force motivating any rebuild delays predating June 2005 or postdating September 2005.  Minutes of the June 28, 2005 meeting of the City Council of Brewton confirm that at that time the Council unanimously passed a "ninety (90) day moratorium on rebuilding signs/billboards until a new Ordinance can be written and presented."  (Doc. 54, Exh. 10, at 3.)[10]  Diurno's testimony reinforces the premise that this was a

---

[10]    Here the Court must digress to address a flap that has arisen between the parties concerning the City's Exhibit 10.  Salter objected to Exhibit 10 because those meeting minutes

limited, 90-day moratorium.  (Diurno Dep. (doc. 54, Exh. 21), at 48-49.)  Additionally, another

City representative, Dewayne King, avers that the moratorium had no adverse effect on the

timing of the rebuilding of the four signs, inasmuch as the moratorium expired on September 28,

2005, it was not renewed at that time, and Salter was fully apprised of both the nature and

duration of the moratorium from its own attendance at City Council meetings.  (King Aff.

11/13/07, ¶¶ 2-3.)[11]

_____

did not contain the mayor's signature or clerk certification as required by the City Code and
Alabama law, respectively.  (Doc. 64, at 3.)  This objection prompted the City to file a Motion to
Substitute Exhibit (doc. 65), seeking to submit a signed, certified copy of the June 28, 2005
meeting minutes to replace the unsigned copy previously filed as the City's Exhibit 10.  In
response to this routine matter, Salter filed a Response (doc. 68) objecting to the requested
substitution on the grounds that (a) the City was flouting evidentiary deadlines by submitting
"grossly untimely" supplemental evidence, and (b) allowing substitution of the signed copy of
the meeting minutes should "recommence the briefing process" by triggering another full round
of summary judgment briefing.  These objections are not well taken.  The technical defects in the
original Exhibit 10, while perhaps rendering it inadmissible at trial, do not bar its consideration
at the summary judgment stage because that exhibit can obviously be reduced to admissible form
at trial via the substituted version, which bears both the required signature and the required
certification.  Thus, Salter ignores the well-established principle that even inadmissible evidence
may properly be considered on summary judgment if it may reasonably be reduced to admissible
form at trial.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for
summary judgment, we may consider only that evidence which can be reduced to an admissible
form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322,
1327 n. 2 (S.D. Ala. 2003) (explaining that even unauthenticated documents may be considered
at summary judgment so long as "it is apparent that those documents can be reduced to
admissible, authenticated form at trial.").  Furthermore, the City was not "grossly untimely" with
its request to substitute, but rather did so promptly, within the established summary judgment
briefing deadlines.  And no possible prejudice can accrue to Salter because the substituted
exhibit is not a "new" document and effects no substantive change to the record, but instead
simply corrects a non-substantive technical defect identified by Salter.  No further briefing is
necessitated by the requested substitution, as the Court is fully apprised of Salter's position as to
the merits of this document as it relates to the pending cross-motions for summary judgment.
For all of these reasons, the City's Motion to Substitute Exhibit (doc. 65) is **granted**, and
Salter's objections to same are **overruled**.

[11]     The City also proffers evidence that Salter was not interested in rebuilding the
damaged signs in Brewton until long after Hurricane Ivan.  In another lawsuit, Salter
representative David McCurdy testified over the span of two depositions that, in the aftermath of
Ivan, Salter initially concentrated on restoring damaged signs in Milton, Florida, where its
headquarters are located, and that its signs were not restored in the Milton area until the summer

But Salter counters the City's evidentiary showing with its own evidence that the City relied on the moratorium both before its alleged beginning date and after its alleged expiration date to deny Salter's requests to rebuild the signs.  As discussed *supra*, Salter's evidence shows the City relying on the moratorium to deny Salter's requests in late 2004, well before the June 2005 moratorium was formally implemented in Brewton.  Moreover, Salter's evidence is that Diurno stated at a City Planning Commission meeting on December 5, 2005 (more than two months after the moratorium allegedly expired) that Salter would not be allowed to replace nonconforming signs in Brewton until the signs "are conforming and the sign ordinance changes get done."  (Doc. 54, Exh. 11, Dec. 5, 2005 meeting minutes, at 1.)  More generally, Salter submits the Third Declaration of Mike Crawley, in which he states that between September 2004 and July 2006, "every time [Salter] spoke with someone from the City regarding rebuilding the signs during this time frame, they told [Salter] we could not rebuild the signs because of the City's moratorium."  (Doc. 64, Exh. B, at ¶ 5.)  Crawley further denies that at any time during that time frame the City ever articulated its position that the four signs in question had sustained more than 50% damage during the Hurricane, even though this statement appears incongruous with the very December 5 meeting minutes cited by Salter.  (*Id.*)[12]

_____

of 2005, nearly a year after the Hurricane.  (Doc. 63, Exh. 3, at 26-27; doc. 63, Exh. 4, at 96-97.)  Salter's objection that such testimony is inadmissible hearsay because it relates to another lawsuit is **overruled**.  Such evidence is properly considered on summary judgment pursuant to the legal standard set forth in footnote 10, *supra*, because it can plainly be reduced to admissible form at trial.  Moreover, Crawley testified that a total of 300 Salter signs (or as much as 20-25% of the company's total sign inventory) in Alabama and Florida required repairs after Hurricane Ivan, and that such repairs were not completed for approximately a year and a half.  (Crawley Dep. II, at 26.)  Viewed in the light most favorable to the City, this evidence reasonably supports an inference that Salter was not prepared to rebuild the signs in Brewton, regardless of the City's alleged delays in allowing them to reapply, until well after September 2004.

[12]        At this time, it is appropriate to address two other factual issues raised by Salter in response to the City's presentation of facts concerning the moratorium and the failure of Salter to apply to rebuild the signs prior to July 2006.  First, Salter points to deposition testimony from Diurno that the City had imposed two moratoria on sign permits, the 90-day one and a previous moratorium from 1998 that was to last until a new sign ordinance was passed, which never happened.  (Diurno Dep (doc. 57, Exh. J, at 47-48.)  Salter parlays this testimony into an argument that Salter has continuously had a moratorium in effect from 1998 through the present.  That is one inference that may be drawn from Diurno's indirect testimony, but a jury certainly

Ultimately, then, the record and the parties' flurry of briefing on the subject devolves to a dizzying tit-for-tat as to the underlying facts of the parties' dealings between September 2004 and July 2006.  The only material undisputed facts emerging from this proliferation of deposition transcripts, dueling affidavits, and objections to each other's proposed statements of fact are these: (a) at least four Salter signs in Brewton were damaged by Hurricane Ivan in September 2004; (b) at some point the parties disagreed as to whether those four signs were damaged in an amount greater than or less than 50% so that any repair or replacement would be governed by the existing Ordinance; (c) during at least part of the time period from September 2004 through July 2006, the City had imposed a formal moratorium on rebuilding signs; and (d) Salter did not submit written applications to rebuild its signs until July 2006.  Everything else is in dispute.

### D.     BSA's Applications to Rebuild the Damaged Signs in July 2006.

It is undisputed that Salter first submitted written applications to rebuild the Hurricane-

---

would not be required to so conclude.  In none of the excerpts provided was Diurno ever asked by plaintiff's counsel how long the 1998 moratorium actually lasted, and the City has argued that there was never a 1998 moratorium.  Therefore, a triable issue of fact is presented as to the timeframe and duration of the City's moratoria on sign building or repair.  Second, Salter suggests that it was not permitted to file rebuild applications prior to July 2006; however, the evidence is once again disputed on that point.  Salter's evidence (which the City contests) is that the City told Salter at some unspecified time that there was no need to file applications at that time because of the moratorium.  Moreover, a Salter representative testified that he understood that in order to rebuild the signs, Salter "probably had to apply in writing.  But we had some verbal conversations that led us to believe we couldn't beforehand."  (McCurdy Dep. (doc. 54, Exh. 7), at 12.)  Plaintiff's counsel's characterization of the evidence as being that "City officials continually told them that no applications would be accepted on account of the Moratorium" (doc. 64, at 7-8) takes unwarranted liberties with the record because Salter's own evidence is that the City merely "put off [Salter] verbally" (Crawley Dep. I, at 87), not that the City repeatedly forbade Salter from applying or otherwise told Salter its applications would not be accepted.  When asked point-blank whether the City had instructed it not to file applications previously, Salter representative Crawley was evasive, stating only that the City "told us essentially there was no need to" file its applications, whatever that "essentially" qualifier might mean.  (Crawley Dep. II, at 48.)  In connection with Salter's opposition brief to the City's motion for summary judgment, however, Crawley signed a declaration attesting for the first time that City officials told him in late 2004 that the moratorium would bar Salter from even submitting written applications to rebuild the signs.  (Crawley Decl. III, at ¶ 6.)  There is thus a jury question as to whether Salter could have filed its applications prior to July 2006, and as to its reasons for failing to do so.

damaged signs in July 2006.  (McCurdy Dep. (doc. 54, Exh. 7), at 12; King Aff. 11/13/07 (doc. 54, Exh. 25), ¶ 6.)  Predictably, the parties disagree as to what happened next.  For its part, Salter submits evidence that Dewayne King (a Compliance Officer for the City) informed Salter representatives "that the applications were again being denied based upon the City's Moratorium."  (Crawley Decl. II (doc. 57, Exh. F), ¶ 7.)[13]  The City, by and through an Affidavit from King, denies that the moratorium extended past September 28, 2005, and further denies that the moratorium had any bearing on the timing of Salter's rebuilding efforts or that the City ever denied Salter the right to rebuild.  (King Aff. 11/13/07, ¶¶ 2-4.)  Once again, a fact question is presented.

The parties apparently agree that they engaged in negotiations in August 2006, concerning the specifications of the signs to be rebuilt.  (Crawley Decl. III (doc. 64, Exh. B), ¶¶ 7-8; King Decl. 11/13/07, ¶ 7.)  In fall 2006, the City authorized Salter to rebuild the four signs as two-sided signs with dimensions of 6' x 12', whereas the previous signs were one-sided and had dimensions of 10' x 24'.  (Crawley Dep. (doc. 54, Exh. 3), at 21-22; King Decl. 11/13/07, ¶¶ 8-9.)[14]  Salter rebuilt its signs in the fall of 2006, and no further disagreements occurred between

---

[13]    Crawley's representation that applications were "again being denied" is counterfactual on its face (or at least very poorly worded) because there is no evidence that any applications by Salter to repair the signs had been denied previously.  This was the first denial.

[14]    Salter's evidence is that, after negotiations, it "agreed to rebuild [the damaged signs] with smaller faces."  (Crawley Decl. III, ¶ 8.)  Yet now Salter insists that it "denies any implication that it waived any claim based on the size differential."  (Doc. 64, at 8.)  Thus, Salter's position is that despite the fact that it admittedly voluntarily agreed to rebuild its signs with 6' x 12' faces, it should be allowed to pursue claims against the City based on the smaller sign faces.  On this point, then, Salter would have its cake and eat it too.  In any event, review of the pleadings does not reflect that Salter has brought any claim in this action contesting the City's determination that the rebuilt signs must conform with the size requirements of the Ordinance because they were more than 50% destroyed.  It is improper for a party to use summary judgment briefs to effect a *de facto* amendment of its pleadings to assert new causes of action.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  To the extent that Salter purports to do so here, those efforts are rejected.

the parties with respect to those four signs.  (Crawley Dep., at 25.)[15]  Based on these events,
Salter seeks relief in this action for the delays in the rebuilding applications, which it attributes to
the City and the City's moratorium.

        **E.**        ***The Nine Sign Applications of July 2006.***

        This lawsuit is not confined to the rebuild applications.  On July 26, 2006, Salter
submitted applications to the City for permits to build nine new off-premises outdoor advertising
signs with proposed dimensions of 72 square feet.  (Doc. 54, Exh. 12; McCurdy Decl. (doc. 57,
Exh. C), ¶ 8.)  On August 23, 2006, King sent a letter to Salter advising it that the permits had
been denied and that the "primary reason" for such denial was "that Brewton's Sign Ordinance
presently in effect prohibits the issuance of permits for new Off-Premise signs [or] billboards."
(Doc. 54, Exh. 14.)  However, Salter's evidence is that on August 2, 2006, several weeks before
that letter, King contacted Salter by telephone and indicated that all nine applications would be
denied because "there is a Moratorium until the City has their court case with Studio 205
[another sign company] and the new sign ordinance is in place."  (McCurdy Decl., ¶ 10.)[16]  There
is thus an obvious tension between the explanation set forth in King's letter (regarding the
Ordinance's prohibition on permits for new off-premises signs) and that conveyed in his earlier
telephone call to Salter.  Nonetheless, both sides agree that Salter's applications to erect the nine
new off-premises billboards were in fact denied by the City in August 2006.

---

[15]      In the face of undisputed evidence that the City authorized Salter to rebuild the
signs in fall 2006, and that Salter in fact rebuilt the signs in fall 2006, Crawley's statement that
"[o]n August 16, 2007, the City issued permits authorizing us to rebuild the signs" (Crawley
Decl. III, ¶ 9) is obviously incorrect.

[16]      The City disputes Salter's suggestion that the City was still operating under a
moratorium in August 2006 and that the moratorium prompted the denial of those sign
applications.  In that regard, King avers that as of July 2006 "there was no moratorium in place
and the expired moratorium did not have anything to do with the ultimate denial of those new
sign applications."  (King Aff. 11/13/07, ¶ 10; Yuhasz Aff. I (doc. 54, Exh. 24), ¶ 11.)  King
further avers that Salter was "misinformed" if it was told that the moratorium triggered the
denial of those applications, inasmuch as the real reason for the denial was the Ordinance's
prohibition on new off-premises signs.  (King Aff. 11/13/07, ¶¶ 10-11; Yuhasz Aff. I, ¶ 11.)  Of
course, the City's evidence on this point merely creates a question of fact on summary judgment
as to whether the moratorium did or did not animate the City's denial of Salter's nine billboard
applications in August 2006.

Following that denial, Salter submitted nine applications for administrative appeal / variance concerning those proposed signs.  (McCurdy Decl., ¶ 13.)  At a meeting conducted on January 22, 2007, the City's Board of Zoning Adjustments took up the requests.  Several City officials spoke out against the requested variances, reasoning that the Ordinance prohibits "new billboards" and that many of the requested billboards were located on sites that already had signs, which would further violate the Ordinance.  After input from Salter officials, City officials, and members of the public, the Board of Zoning Adjustments voted unanimously to deny the variances at its January 22 meeting.  (Doc. 54, Exh. 16.)  A written Notice of Decision memorialized that decision, stating that there were already on-premises signs at eight of the designated locations, that the ninth permit location was in a flood zone, that no showing of undue hardship had been made, and that the City was considering a new ordinance that might allow construction of new off-premises signs that meet certain specifications.  (Doc. 54, Exh. 17.)

> ### F.    *The Nine Noncommercial Sign Applications of May 2007.*

One more round of sign applications is of relevance to this litigation.  On May 14, 2007, more than three months after Salter filed the Complaint and roughly two weeks after the undersigned entered an Order (doc. 14) denying in part Salter's request for preliminary injunction, Salter re-submitted the nine sign applications requesting permission to erect outdoor advertising signs on the same properties that were the subject of the denied July 2006 permit applications.  The twist this time was that all nine applications bore the description "noncommercial content only sign."  (Doc. 54, Exh. 18.)[17]  The applications delineate the "first copy" proposed to be displayed on such billboards as being slogans such as "Pray to God," "Freedom of Speech," "America Love It or Leave It," "Buckle Up in Your Truck," "Attend the

---

[17]    This scheme was apparently devised by Salter to skirt the adverse repercussions of the preliminary injunction Order entered on April 26, 2007.  In that Order (doc. 14), the undersigned concluded that, as a matter of Eleventh Circuit law, a prohibition against off-premises billboards cannot implicate noncommercial signs because noncommercial messages are by definition onsite signs.  (*See* doc. 14, at 21-22.)  Salter's May 2007 sign applications appear calculated to test the limits of both the April 26 Order and Eleventh Circuit jurisprudence on the topic.  Indeed, the "Application Statement" accompanying each of the sign applications specifically characterized the "noncommercial" designation of those applications as being in "response" to the April 26 Order.  (Doc. 57, at Exh. O.)

Church of Your Choice," "Integrity Pass It On," "God Bless America," and "Support Our Troops." (*Id.*) There was no box to check or blank provided on the form for Salter to specify its intent to restrict these signs to noncommercial content; rather, Salter unilaterally proffered this information to the City. The City's evidence is that these were the first noncommercial sign applications it had ever received during 12 years of King's employment as a City compliance officer. (King Dep. II (doc. 54, Exh. 20), at 35.)

Nothing in the applications reflected how long this "first copy" would be posted or specified Salter's intentions after its removal. However, a typewritten "Application Statement" accompanying each of the nine application packages stated as follows: "unless the City changes its sign regulations or a court finds them invalid this sign will not display commercial messages. Bill Salter ... hereby warrants that messages on this sign will be limited to noncommercial messages only such as those of churches, charities, non-profits, governmental entities, and public service announcements." (Doc. 57, at Exh. O.)[18] In this litigation, Salter has expressed its plans somewhat differently, framing its aim as being "eventually" to replace the non-paying slogans of the "first copy" with "the noncommercial messages of paying advertisers, such as churches, hospitals, schools, and governmental entities." (Crawley Decl. III, at ¶ 10.)

On May 25, 2007, the City acknowledged receipt of the nine applications via nine letters to Salter. (Crawley Decl. II, ¶ 14.) Each of these letters (which were signed by King) stated that certain "additional information and verification" was necessary "[g]iven the unorthodox nature of the application," such unorthodoxy being the inclusion of the legend "noncommercial content only sign" on the permit application. (Doc. 57, Exh. P.) The specific categories of information and verification requested by the City consisted of the following: (1) "written verification that you intend to post only non-commercial messages, and further, that the signs will never be converted to signs containing commercial messages"; (2) a copy of the lease agreement with the property owner/lessor reflecting his/her awareness that "any permits issued by the City are for signs of a non-commercial character only, and that commercial signs are not to be posted at any

---

[18]     Salter's evidence is that all nine application packages submitted in May 2007 included the verbatim "Application Statement." (Crawley Decl. II (doc. 57, Exh. F), ¶ 13.) Yet the City omitted those Application Statements from the copies of the application packages that it submitted as part of the summary judgment record. (Doc. 54, Exh. 18.)

time present or future"; (3) verification from the owner that if a sign were permitted, "the owner shall be required to remove any current on premise sign under § 10.775 of the sign ordinance"; (4) for any sign to be erected in a flood plain, Salter was to submit engineer drawings satisfying the requirements of the National Flood Insurance Program and the City zoning ordinance; and (5) verification that Salter had authority to submit a permit application on behalf of the property's owner. (*Id.*) Parallel letters were sent to the property owners in whose names Salter had submitted the applications. (Doc. 57, Exh. Q; Crawley Decl. II, ¶ 15.)

Given the context of the already ongoing litigation between the parties, the May 25 letters touched off a series of heated exchanges. On June 1, 2007, Salter sent the City a set of nine letters that responded in small part to the information requests while denying that it was obligated to do so and accusing the City of chicanery and bad faith. (Doc. 57, Exh. R; Crawley Decl. II, ¶ 17.) A week later, on June 8, 2007, the City responded with letters of its own. These letters, which were not identical across all nine applications, sharpened and refined the requests for information, to-wit: (1) for parcels in which Salter and/or the property owners had submitted multiple pending applications, a declaration as to which application Salter intended to pursue; (2) an explanation for why the general prohibition on two hearing requests before the Board of Adjustment for the same variance for the same property within a 12-month period should not be enforced; (3) for the one application pertaining to property in a flood way, a so-called "no-rise certificate" relating to the proposed construction;[19] (4) reiteration that the City required Salter to submit a lease showing that the owner/lessor consented to the installation of a sign exclusively

---

[19]     The City's evidence is that the City is required by the National Flood Insurance Program to obtain a no-rise certificate for any construction (including sign construction) in a "flood way." (Yuhasz Aff. II (doc. 63, Exh. 1), ¶ 3.) Salter counters that this request lacks legitimacy because Salter has obtained permits from the City in the past to post signs in the "flood plain zone" without any need for a no-rise certificate or associated engineering documents. (Crawley Decl. II, ¶¶ 24-26.) The City responds by distinguishing between a "flood way" (which is defined in the City Code as the channel or other part of the flood plain that discharges the bulk of regional flood waters) and a "flood plain" itself (which in the City's view poses a far lower risk than the flood way). (Yuhasz Aff. II, ¶ 5.) The City's evidence is that no other applications have been submitted to build a sign in a flood way in Brewton, other than Salter's May 2007 request to build a sign on the so-called "Burnt Corn Creek" parcel. (*Id.*, ¶¶ 5-7, 9.)

for noncommercial messages; and (5) reiteration that for applications pertaining to locations where there was already an on-premise sign, the owner must agree to remove such sign before a new sign would be allowed.  (Doc. 54, Exh. 19.)[20]

Recitation of the minutiae of the parties' interactions during this time would not aid the Court in understanding or resolving the issues on summary judgment (particularly given the heavy involvement of counsel for both sides in crafting this war of letters).  Nonetheless, a letter from the City's counsel to Salter's counsel dated June 8, 2007 is helpful in encapsulating the status of the nine sign applications.  In that letter, the City offered a clear synopsis of how each application was situated at that moment, to-wit: (1) the Burnt Corn Creek parcel permit was "due to be issued" pending clarification from Salter as to which of two applications for that parcel it was pursuing, as well as submission of the necessary no-rise engineering certificate for FEMA purposes because the parcel is in a flood way; (2) the Brewton Marine parcel application required further verification because Salter's lease was not with the true owner of the parcel, and the true owner must consent to Salter's sign and verify his understanding that it may prevent future construction of an on-premises sign; (3 & 4) the two applications for signs on the Stallworth property on U.S. Highway 31 South "will be granted, provided [Salter] comply with the requirement set forth below that [its] lease be made consistent with [its] application" by clarifying that the sign would be used exclusively for noncommercial purposes; (5) the Jackson

---

[20]      As to these last two items, the City's explanation for why this information is needed is as follows: The leases submitted with Salter's May 2007 permit applications reference "off premise outdoor advertising" and at least one of them references advertising by competing businesses.  (Yuhasz Aff. I (doc. 54, Exh. 24), ¶ 14).  Thus, in the City's view, the lease documents create ambiguity as to whether the owner/lessor of the property knew or intended to authorize Salter to erect billboards on its property for exclusively noncommercial uses because the leases referenced off-premise commercial advertising billboards.  (Doc. 54, Exh. 22, at 3.) Similarly, the City's evidence is that "there are existing on-premises signs on some of the properties, and an additional sign would exceed the number of signs allowed per property under the Sign Ordinance."  (Yuhasz Aff. I, ¶ 14.)  Although Salter submits evidence of numerous properties in Brewton containing more than one sign for each street frontage, the City explains the apparent discrepancy with evidence that the multiple-sign parcels "either predate the current Sign Ordinance and were grandfathered in as prior non-conforming signs or are on property which has more than one thousand feet of street frontage, or fit some other exception set forth in the Sign Ordinance."  (King Aff. II (doc. 63, Exh. 2), ¶¶ 5-6.)

-16-

Hines application required verification from the landowner that he consented to the sign and that he understood it may prevent construction of a future on-premise sign; (6 - 8) the Kenney's Yamaha, Marie Robinson, and Creamer Dozier applications required verification that the landowner would remove the existing on-premise sign in exchange for Salter's noncommercial sign; and (9) the Frit Car application required verification from the landowner that he consented to the sign and that he understood that it may prevent construction of a future on-premise sign. (Doc. 54, Exh. 22.)  The June 8 letter further specified that all nine sign applications must include underlying leases that are not inconsistent with the sign applications themselves, in terms of the exclusively noncommercial character of the signage that Salter intended to display.  (*Id.*)

The summary judgment record is silent as to what happened next.  By all appearances, Salter did not undertake to comply with any of the June 8 information requests, most of which do not appear onerous.  Rather than attempting to work with the City to reach a mutually satisfactory arrangement, Salter elected to pursue further litigation.  Indeed, Salter successfully amended its Complaint in this action in August 2007 to assert additional causes of action against the City pertaining to these May-June 2007 informational requirements.  As a result, there are nine pending Salter sign applications that the City professed willingness to grant seven months ago upon submission of certain requested information.  Those applications remain pending today, and have never been denied.  (Yuhasz Aff. I, ¶ 13.)  The City is simply waiting on the additional information requested.  (*Id.*)  Without demonstrating that it could not reasonably comply with these requests and without attempting such compliance, Salter instead asks this Court to declare such information requests unconstitutional and to award damages to Salter for delays in the permitting process because the City conditioned the granting of sign permits on that information being supplied.

## II.    Procedural History.

### A.    *The Amended Complaint.*

On February 2, 2007, Salter initiated this action against the City pursuant to 42 U.S.C. § 1983 by filing the Complaint (doc. 1) in this District Court.  In this action's original formulation, Salter sought monetary damages, declaratory relief, and injunctive relief with respect to its contentions that the City had enacted an unconstitutional moratorium on outdoor signs in violation of the First Amendment, had violated Salter's due process rights via delaying tactics

and bogus information requests made in connection with Salter's appeal/ variance requests, and had imposed a sign ordinance that violates both the First Amendment and the equal protection requirements of the Fourteenth Amendment.  The operative pleading, which is the First Amended Complaint (doc. 40), reiterates these causes of action, but also includes an additional claim that the City's alleged refusal to grant Salter's applications to post noncommercial signs amounts to selective enforcement of the Ordinance, impermissibly favoring commercial speech over noncommercial speech and the speech of certain groups over that of others, all in violation of Salter's equal protection rights.

On its face, then, the sprawling 32-page First Amended Complaint identifies the following legal issues on which Salter's claims for relief are predicated: (a) whether the purported nine-year moratorium on signs violates Salter's free speech rights; (b) whether the City's delays in allowing Salter to repair the four signs or in processing the nine noncommercial applications violate due process; (c) whether the Ordinance violates the First Amendment via a permitting requirement that lacks minimum safeguards and a content-based regulatory scheme that "leave[s] virtually no avenue open by which citizens can speak freely" (doc. 40, ¶ 68) in the City of Brewton; (d) whether the Ordinance violates equal protection by favoring certain categories of speech over others; and (e) whether the City has selectively enforced certain provisions of the Ordinance against Salter, to Salter's detriment and in violation of Salter's equal protection rights.

**B.      The Motion for Preliminary Injunction.**

Weeks after filing its initial complaint, Salter filed a Motion for Preliminary Injunction, maintaining that the City should be preliminarily enjoined from enforcing the Ordinance and the alleged moratorium, and from misinterpreting the Ordinance as precluding all new off-premises advertising signs.  In light of plaintiff's allegations of irreparable harm based on alleged suppression of its First Amendment rights, the Court declined the City's request that the preliminary injunction motion be stayed until after the close of discovery.  After briefing by the parties, the Court entered a 32-page Order (doc. 14) on April 26, 2007 that granted Salter's request for preliminary injunction in part and denied it in part.  *See Bill Salter Advertising, Inc. v. City of Brewton, Ala.*, 486 F. Supp.2d 1314 (S.D. Ala. 2007).

Because certain aspects of that April 26 Order have profoundly affected the subsequent

-18-

path of this litigation and the arguments presented by the parties on summary judgment, it is helpful to revisit those holdings now.  In the April 26 Order, the Court first found that Salter had failed to show a substantial likelihood of success on its claim that the City was misinterpreting the Ordinance to prohibit new off-premises signs such as the nine new signs envisioned by Salter's July 2006 applications.  (Doc. 14, at 13-16.)  Next, the Court found that Salter was entitled to a preliminary injunction barring the City from enforcing the moratorium on sign construction or repair, inasmuch as it appeared substantially likely that the moratorium had been in effect for at least 22 months, that it had harmed Salter through denial of its permit applications, and that the City had failed to justify its prolonged duration.  (*Id.* at 16-20.)  Third, the Court found that no preliminary injunction was appropriate as to the Ordinance's prohibition on new off-premises billboards.  (*Id.* at 20-24.)  Although Salter insisted that the off-premises ban amounted to a prohibition on both commercial and noncommercial speech, the undersigned concluded, based on binding precedent, that the off-premises sign prohibition was limited to commercial signs, as a matter of law.[21]  After reviewing pertinent authorities, the undersigned determined that "the City's prohibition on off-premises billboards does not and cannot reach noncommercial speech" because noncommercial signs cannot be "off-premises" signs, as a matter of law.  (*Id.* at 21.)  The Court also explained that the City's prohibition on new off-premises commercial billboards appeared likely to satisfy the four-prong test enunciated in *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).  (*Id.* at 22-24.)  Finally, with respect to Salter's objections to the Ordinance's exemptions, the degree of discretion given to City officials, and the sufficiency of the procedural safeguards, the Court found that it was substantially unlikely that

---

[21]     In particular, the Court followed *Southlake Property Associates, Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114 (11th Cir. 1997), in which the appellate court found that a similar ban on off-site billboards imposed no restraint on noncommercial speech because "[t]he definition of billboard as an offsite advertising sign does not include noncommercial speech as such speech is always onsite."  *Id.* at 1119.  The Court also observed that several years later, the Eleventh Circuit reaffirmed *Southlake*, explaining that "according to the law of this Circuit, noncommercial messages are by definition onsite signs and therefore certainly not treated unfavorably compared with commercial signs" in the context of an off-site ban.  *Coral Springs Street Systems v. City of Sunrise*, 371 F.3d 1320, 1344 (11th Cir. 2004).

Salter had standing to pursue such claims under a long line of Eleventh Circuit authority culminating in *KH Outdoor, L.L.C. v. Clay County, Fla.*, 482 F.3d 1299 (11th Cir. 2007).  Simply put, even if Salter were correct about each of these infirmities, its July 2006 off-premises applications still would be properly denied under the prohibition on new off-premises signage, so it was of no consequence to Salter whether the other challenged Ordinance provisions were valid or not.

C.     *The Summary Judgment Motions.*

At the close of discovery, the City filed a Motion for Summary Judgment seeking entry of judgment in its favor on this action in its entirety, while Salter filed a Motion for Partial Summary Judgment seeking entry of judgment in its favor as to certain aspects of this dispute. Salter's Motion seeks entry of judgment as a matter of law on the questions of whether the City violated Salter's First Amendment rights by (a) enforcing the moratorium to delay Salter's rebuild applications and (b) imposing bogus information requests on the May 2007 noncommercial sign applications.  The City's Motion is predicated on the following grounds: (1) Salter lacks standing to challenge any aspect of the Ordinance other than the provisions regulating off-premise signs; (2) the Ordinance does not violate Salter's constitutional rights; (3) Salter's claims relating to the moratorium are not redressible; and (4) the City's handling of Salter's requests to rebuild four signs after Hurricane Ivan and to build nine noncommercial signs in May 2007 do not violate equal protection.  Although these motions are overlapping, they are distinct and will therefore be considered separately.[22]

---

[22]     The Court's analysis of these motions is hampered by the parties' failure to link their arguments to particular causes of action set forth in the First Amended Complaint.  Indeed, in some instances the parties debate at length over disembodied legal issues not squarely presented in the First Amended Complaint.  The pleadings are the wellspring of all legal claims and affirmative defenses joined herein, yet the parties' summary judgment submissions are in certain respects untethered from those pleadings, exacerbating the confusing nature of the parties' filings.  To compound the disarray, plaintiff's legal theories appear to have morphed considerably since the filing of the First Amended Complaint, yet no further amendments to the pleadings have been made, so in some instances the City seeks summary judgment on claims that Salter is apparently no longer pursuing, or Salter is seeking summary judgment on claims not expressly set forth in the pleadings that are apparently being tried by consent of the parties.

### III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007); *see also May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1333 (S.D. Ala. 2006) (same). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Godard*, 485 F. Supp.2d at 1291; *see also May*, 458 F. Supp.2d at 1333.  Such is largely absent here.

**IV.     Analysis of Salter's Motion for Summary Judgment.**

     *A.     Whether the Moratorium Violates Salter's First Amendment Rights.*

As an initial matter, Salter asks the Court to find as a matter of law that its First Amendment rights were violated when its rebuild applications were delayed because of an unconstitutional moratorium.  Salter's position is that the City delayed approval of Salter's rebuild applications for more than two years following Hurricane Ivan based on a pair of moratoria, one of which allegedly dates back to 1998 and was never lifted and the other of which was imposed in June 2005 and never lifted until this Court's April 26, 2007 Order preliminarily enjoined the City from enforcing it.  Salter does not argue, and cannot reasonably argue, that all moratoria are unlawful.  *See generally Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 338, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (recognizing that a moratorium is properly viewed as "an essential tool of successful development").  Rather, Salter's legal arguments on the moratorium issue are predicated on the notion that the City's moratoria were of excessive duration.  In that regard, Salter maintains, "the 1998 Moratorium has been in effect for nine years, while the June 28, 2005 Moratorium was in effect for 22 months prior to being invalidated by this Court."  (Doc. 58, at 13.)  Not only were these moratoria too long, Salter claims, but also they harmed Salter because the City relied on them to delay Salter's rebuild applications for a period of two years.  (*Id.* at 9.)

It is elementary that on a Rule 56 Motion, "we view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant."  *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Salter's argument proceeds in disregard of this standard.  As discussed *supra*, there is record evidence that the City passed a 90-day moratorium on sign rebuilding on June 28, 2005 and that such moratorium was neither renewed nor extended following its expiration on September 28, 2005.[23]  There is also record evidence that the delays

---

     [23]     As for the purported 1998 moratorium, there is some doubt as to whether it ever existed.  The City denies as much.  Salter points to City representative Diurno's testimony that he was are of two moratoria, that the first had occurred in 1998, that its purpose was "[t]o get a sign ordinance that everybody could agree on," that the moratorium was to last until a new ordinance was in place, and that no new ordinance was ever passed.  (Diurno Dep. (doc. 57, Exh.

attendant to Salter's rebuild applications had nothing to do with a moratorium, but were instead the product of a long-standing feud between the parties (and initiated by Salter) as to whether the signs in question were damaged to a greater or lesser extent than 50% by Hurricane Ivan. Finally, the evidence taken in the light most favorable to the City is that the delays in the rebuild applications were wholly attributable to Salter, and not to any moratorium, because Salter neglected to submit those applications for the City's consideration (even though it was free to do so at any time) until July 2006, after which such applications were promptly processed and granted. Salter proffers no argument that its constitutional rights were violated by the moratorium even under these facts taken in the light most favorable to the City; instead, Salter simply disputes those factual allegations. Thus, Salter's Rule 56 Motion on this point is dependent on a construction of the record in the light most favorable to Salter, turning the applicable legal standard on its head.

Under any reasonable reading of the record, there are substantial disputed material facts pertaining to the existence of the moratorium and its effect (if any) on the timing of Salter's being granted leave to rebuild the four hurricane-damaged signs. Accordingly, summary judgment is inappropriate for Salter on its claim that its First Amendment rights were violated by

---

J), at 47-48.) Although that testimony can support an inference that the 1998 moratorium was never revoked, it does not appear that Salter ever asked the City (in Diurno's deposition or anywhere else) how long the 1998 moratorium remained in effect. Salter simply assumes from Diurno's fragmentary testimony that the 1998 moratorium must have lasted for nine years. On its Motion for Partial Summary Judgment, Salter is not entitled to the benefit of that strained assumption when other reasonable inferences are possible from the record. Here, it could be logically inferred that the 1998 moratorium must have lapsed before June 2005, else the City would not have implemented a new one at that time. More generally, a fact finder would not be required to make the substantial leap from Diurno's limited and indefinite deposition testimony on this point that the 1998 moratorium was still in effect at all times relevant to this action. That said, the City could have clarified the record considerably by submitting affirmative evidence as to the previous moratorium's scope, rather than simply relying on the unsupported representations of counsel (which cannot be credited on summary judgment, *see Williams v. Saxon Mortg. Co.*, 2008 WL 45739, *5 n.9 (S.D. Ala. Jan. 2, 2008)) that "[t]here was no 1998 moratorium" and that the only previous moratorium was issued in 1989 and became moot when the current Ordinance was passed in 1992. (Doc. 62, at 16 n.1.) Yet the City elected not to submit such evidence, leaving Diurno's incomplete and inconclusive deposition testimony as the sole record evidence of previous moratoria in the City of Brewton.

the City's denial of Salter's rebuild requests for a period of two years on the basis of moratoria. Given the conflicting facts and inferences in the record, it is plainly for the jury to decide whether there was even a moratorium in effect during the relevant time period and whether that moratorium had any bearing on the delays in Salter's rebuild applications. Salter's Motion for Partial Summary Judgment is **denied** as to Count One of the First Amended Complaint, which alleges that the moratorium is an unconstitutional speech restriction.[24]

> **B.** **Whether the City's Information Requests Violate the First Amendment.**

As its other basis for seeking summary judgment, Salter argues that the information requests made by the City in connection with the May 2007 "noncommercial only" sign applications violate the First Amendment.[25]  In response to Salter's May 2007 applications, the

---

[24]    This conclusion is in no way undermined by Salter's claim that "knowledgeable City officials have unquestionably admitted that the reason for the delay in the approval of Salter's rebuild applications was the Moratorium which was passed on June 28, 2005."  (Doc. 58, at 9 (citing Affidavits of Pete Diurno and Dewayne King).  This is a gross mischaracterization of the record.  Review of the cited affidavits reflects only that City officials have unquestionably admitted that a moratorium went into effect on June 28, 2005.  Nothing in the cited affidavits in any way links the moratorium to any delay in approving Salter's rebuild applications, which were not even filed until 13 months later.  Counsel assists neither this Court nor his client by misrepresenting the record in this fashion.  Furthermore, the Court must correct plaintiff's counsel's misstatement that the April 26 Order contained a "holding that the Moratorium is unconstitutional."  (Doc. 58, at 10.)  This is inaccurate.  What the April 26 Order held was that "plaintiff has shown a substantial likelihood of success on the merits as to its claim that the City's moratorium violates the First Amendment."  (Doc. 14, at 18.)  That holding is unavailing to plaintiff at this juncture, because (unlike at the Rule 65 stage) the developed record on summary judgment reveals genuine disputes of fact as to whether that moratorium extended beyond 90 days and whether it had any bearing on Salter's sign rebuilding applications.

[25]    This aspect of Salter's Motion does not neatly correspond to any claim in the First Amended Complaint (doc. 40).  To be sure, in Count Two Salter complains of "bogus information requests" trammeling its constitutional rights.  (*Id.*, ¶¶ 60-62.)  However, Count Two is couched in terms of due process violations, while Salter's summary judgment motion frames the constitutional issue pertaining to the information requests as one under the First Amendment.  Similarly, this argument does not appear to implicate Count Three (which references favoring commercial speech only in the sense of the prohibition on new off-premises signs) or Count Five (which objects to the information requests solely on equal protection grounds).  The City has not objected to this recasting of the First Amended Complaint to encompass First Amendment claims based on the May/June 2007 information requests; therefore, it appears that the parties are trying this issue by express or implied consent, pursuant to Rule 15(b), Fed.R.Civ.P.

City requested verification that only noncommercial messages will be posted, that the underlying lease documents confirm the owner/lessor's awareness that the sign on their property would be used exclusively for noncommercial purposes, that site owners would remove any current on-premises signage to comport with the Ordinance's requirement of only one sign per street frontage, that a no-rise certificate would be provided for the Burnt Corn Creek parcel, and that Salter would verify its authority to submit permit applications on behalf of the owner/lessor.

Salter's theory of liability is that these requests (with which it has never attempted to comply) violate the First Amendment because "the City has imposed requirements on Salter's *non*commercial applications that are not applicable to commercial sign applications."  (Doc. 58, at 20.)  "In order to be constitutional, a time, place, and manner regulation may not be based upon the content of the regulated speech."  *Café Erotica of Florida v. St. John's County*, 360 F.3d 1274, 1286 (11th Cir. 2004).  Ordinances that discriminate in favor of commercial messages over noncommercial messages are content-based and are therefore subject to strict scrutiny.  *See, e.g., KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271 (11th Cir. 2006) (applying strict scrutiny to billboard ordinance that "undeniably favors commercial speech over noncommercial speech," such that it was a content-based restriction); *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1232-33 (11th Cir. 2006) ("If we determine that the ordinance ... discriminates in favor of commercial messages over [noncommercial] ones, it is content-based and we apply strict scrutiny."); *Café Erotica*, 360 F.3d at 1287 ("discriminating in favor of commercial messages over political ones, without regard to the actual messages conveyed, is also content-based discrimination").  Of course, "[a] content-based restriction on speech must be necessary to serve a compelling state interest and narrowly drawn to achieve that end" in order to withstand constitutional scrutiny.  *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005) (citation omitted); *see also City of Trussville*, 458 F.3d at 1271 (content-based restriction in sign ordinance "will pass constitutional muster only if it is the least restrictive means of advancing a compelling government interest").

The premise of Salter's Motion for Summary Judgment, then, is that the City's May 2007 information requests violate the First Amendment by impermissibly favoring commercial speech over noncommercial speech.  However, the record is devoid of evidence of impermissible discrimination against noncommercial messages.  Salter submitted nine permit applications to

post commercial off-premises advertising signs in July 2006, and all such applications were denied out of hand by the City pursuant to § 10.775(7) of the Ordinance, which provides that "[n]o new off-premises signs or billboards will be permitted in any zone." *Id.* When Salter decided to resubmit the nine permit applications in May 2007, seeking to construct exactly the same nine sign structures at exactly the same nine locations where permission had previously denied, but this time specifying its intent to build "noncommercial content only signs," the City did not deny the permit applications out of hand. Instead, the City professed willingness to grant those permits upon compliance by Salter with certain information requests. Salter has never argued or established that such information requests would be onerous, or that Salter could not reasonably comply with them with a modicum of expense or effort. The Court is at a loss to understand how the City lodging information requests as a prerequisite to granting noncommercial sign permits can possibly be discriminating against noncommercial speech when commercial iterations of those precise permit applications were denied outright. The undisputed facts confirm that, with respect to these nine permit applications, the City treated noncommercial speech more favorably than commercial speech, inasmuch as the City summarily denied the commercial applications while expressing willingness to grant the otherwise-identical noncommercial applications upon submission of certain additional information that Salter has never shown or suggested it cannot readily procure.[26] These facts do not reflect content-based

---

[26]    Salter's argument to the contrary relies on the fact that the City posited no such information requests for off-premises commercial sign applications following the implementation of the Ordinance. This argument completely misses the point. Under the plain language of the Ordinance, new off-premises commercial billboards were prohibited. What purpose could possibly have been served by the City making in-depth information requests of commercial advertisers seeking to erect new off-premises commercial signs or billboards? Irrespective of how the advertiser responded to those information requests, the permit applications would be due to be denied pursuant to § 10.775(7). The information would have been neither necessary nor helpful to the City in the context of off-premises commercial sign requests because the applications would have been denied anyway. The Court is unaware of any authority, and Salter has cited none, that would oblige a municipality to play at charades by engaging in the empty gesture of asking prospective off-premises commercial sign advertisers for information that could not possibly make a difference in their fatally flawed permit applications, solely to ensure that noncommercial sign advertisers were not asked more or different questions than commercial sign advertisers were. The First Amendment does not require such hollow endeavors for the sake of keeping up appearances.

discrimination and do not evince favoritism by the City of commercial messages over noncommercial messages.

Salter's position is apparently that the Court should not compare the City's handling of the May 2007 noncommercial applications with the City's handling of those identical applications (minus the noncommercial designation) in June 2006.  Instead, Salter would have the relevant control group be on-premises commercial signs, as to which Salter's evidence is that the City has issued permits under the Ordinance without requiring such information.  According to Salter, if the City has allowed a business to construct an on-premises sign advertising its product or services without submitting to such information requests, then it is discriminatory to subject Salter to such information requests before allowing it to build a noncommercial sign.

Even accepting Salter's contention that on-site commercial applications are the proper control group, the comparison is fallacious.  Three of the contested information requests (*i.e.*, verification that only noncommercial messages would be posted, submission of a lease agreement specifying that only noncommercial messages would be used, and verification of Salter's authority to submit the sign application on the owner's behalf) would have no conceivable relevance to a situation where a business owner sought permission to build a commercial sign on its own premises advertising its own business.[27]  As it would be nonsensical for the City to pose these requests to on-site commercial sign applicants, it was not discriminatory for the City to submit them to Salter in connection with the noncommercial sign applications.  With respect to the fourth information request, the evidence in the light most favorable to the City is that it requested flood information solely with respect to the one Salter

---

[27]       An example illustrates the point.  Suppose Bob's Diner wants to construct an on-premises sign on its property reading "Eat at Bob's."  The City would have no reason to request certification from Bob (the property owner) that he was aware of or intended to post only noncommercial messages, because this is an on-premises commercial sign, which is expressly permitted by the Ordinance.  The difference in Salter's case is that Salter is in the business of posting messages for others, while Bob's message is obviously for his own on-premises use.  If Salter took its ostensibly noncommercial sign and posted an "Eat at Bob's" message even though the sign is not on Bob's property, the sign would violate the Ordinance; therefore, verification is reasonably needed for the Salter sign to make certain that Salter complies.  Such verification would not be germane to Bob's sign application.  This is not disparate treatment or favoritism of particular categories of speech over others.

sign application pertaining to a flood way.  Salter has come forward with no evidence that, following the adoption of the Ordinance in 1992, the City has ever received any commercial sign request for a sign in the flood way; therefore, Salter has not demonstrated differential treatment as to that request either.[28]

The fifth information request sought verification that the property owner would remove any existing on-premise sign.  This request is in accordance with the Ordinance's requirement that there can be only one on-premises sign per property per street frontage.  (Yuhasz Aff. (doc. 54, Exh. 24), ¶ 14; doc. 63, Exh. 5; King Aff. II (doc. 63, Exh. 2), ¶ 3.)  Salter balks that the City is selectively enforcing the one-sign limitation against these noncommercial signs and offers photographs of locations in Brewton that contain multiple on-premises commercial signs per frontage as evidence of such alleged disparate treatment.  (Crawley Decl. II (doc. 57, Exh. F), ¶¶ 20-22; doc. 57, Exh. V.)  But Salter comes forward with no evidence that the City issued permits for any such nonconforming signs to be built.  Indeed, Salter's summary judgment submission fails to delineate a single example of the City authorizing any commercial establishment to

---

[28]    To the contrary, the uncontroverted record evidence is that the City requested flood documentation from Salter solely with respect to the Burnt Corn Creek parcel, that the proposed sign in the Burnt Corn Creek parcel lies in the flood way, that the requested engineering documentation is required by the National Flood Insurance Program for signs in a flood way, and that there have been no other sign applications in Brewton to build a sign in a flood way.  (Yuhasz Aff. II (doc. 63, Exh. 1), ¶¶ 3-10.)  All indications in the record, then, are that the City would require the same "no-rise certificate" compliance of any sign builder (whether for commercial or noncommercial uses) who sought to build in the flood way.  Salter's objections to this evidence are twofold.  First, Salter balks that the City's May 25, 2007 letters requested no-rise certificates for all of Salter's sign applications for parcels in the "flood plain zone," rather than the more precise "flood way."  This argument ignores the fact that on June 8, 2007, the City unequivocally clarified and narrowed its information request for flood documentation to the flood way property and specifically the Burnt Corn Creek parcel.  Salter cannot fashion a constitutional violation from an imprecise information request that was promptly and properly winnowed down to the specific information that the municipality legitimately required as a precondition to issuing a sign permit in a flood way.  Second, Salter objects that the City's evidence of flood requirements is inadmissible because the City has offered an affidavit of its representative on this point, rather than a certified copy of its flood requirements.  Once again, Salter ignores the well-settled standard that evidence need not be admissible to be considered on summary judgment as long as it can be reduced to admissible form at trial.

construct a second sign on a single street frontage in violation of the Ordinance.[29]  Furthermore, the City's evidence is that, with respect to properties in Brewton which currently have more than one sign per premises/per street frontage, "[t]hese signs either predate the current Sign Ordinance and were grandfathered in as prior non-conforming signs or are on property which has more than one thousand feet of street frontage, or fit some other exception set forth in the Sign Ordinance."  (King Aff. II, ¶ 5.)[30]  Salter has presented no evidence to rebut this showing or to suggest that any signs depicted in Exhibit V to plaintiff's evidentiary submission were in fact permitted by the City in defiance or derogation of the Ordinance's one-sign-per-frontage requirement.  Thus, Salter has failed to demonstrate that the City's information request concerning the Ordinance's prohibition of multiple signs on properties where Salter proposed to build new noncommercial billboards in any way singled out noncommercial speech for enforcement purposes.

---

[29]    At most, Salter's evidence demonstrates that there are parcels of land in Brewton on which two commercial on-premises signs now sit facing a single street frontage.  Salter has made no showing that the City permitted or otherwise authorized any such signage, much less that such permits postdate the Ordinance, and no analysis of whether those signs may be subject to exceptions under the Ordinance.  The mere presence of multiple commercial signs on a given property, without more, is not proof that the City was discriminating against noncommercial speech by seeking confirmation from Salter that it would not violate the multiple-signage-per-parcel restriction with these nine May 2007 applications.  There are many potential innocuous explanations for those multiple-sign comparators, and Salter's evidence refutes none of them.

[30]    Salter protests that King's averments on this point are inadmissible because they are couched in terms of being made "to the best of [his] knowledge and belief."  It is a correct statement of law that such qualifiers are not sufficient to raise a genuine issue of material fact.  *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment"); *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (statement by affiant that he "believes" something to be true is insufficient to create an issue of material fact, and is not in accordance with the rules).  But the above-quoted language from King's Affidavit is not subject to any such caveat.  Rather, the paragraph of the King Affidavit cited *supra* purports to state on King's own personal knowledge that to the extent there are properties in Brewton with multiple signs per street frontage, those signs predate the Ordinance or were otherwise subject to an exception.  That statement, rather than any others in the Affidavit, defeats Salter's position on summary judgment by demonstrating that the City was not selectively enforcing the one-sign rule in its Ordinance.

For all of these reasons, Salter is not entitled to summary judgment on its theory that the City's information requests pertaining to the May 2007 noncommercial applications constitute a content-based restriction that violates Salter's First Amendment rights.  The record is devoid of evidence that the City treated any comparable applications for commercial signs under the Ordinance more favorably than Salter's May 2007 noncommercial sign applications.  Accordingly, Salter's Motion for Summary Judgment is **denied** as to that theory of liability.[31]

## V.   Analysis of the City's Motion for Summary Judgment.

The Court now turns to the City's Motion for Summary Judgment, which in some respects mirrors Salter's, but is broader in scope.  In particular, the City contends that it is entitled to summary judgment on the following four grounds: (a) that certain of Salter's claims fail as a matter of law for lack of standing; (b) that the Ordinance's ban on new off-premises signs is not a content-based restriction on speech and does not violate Salter's First Amendment rights; (c) that Salter's constitutional claims pertaining to the moratorium are not redressible; and (d) that the City handled Salter's sign applications in a manner that does not violate Salter's right

---

[31]    Salter devotes considerable attention in its briefs in support of its Motion for Summary Judgment to arguing that the May 2007 information requests were "bogus" because the City did not really need the information it was requesting.  However, the Court has scoured Salter's memoranda (docs. 58, 62) in vain for any legal theory as to why the possibility that such information requests may have been "bogus" would entitle Salter to summary judgment on the legal issues joined in these proceedings.  Such a legal theory may well exist, but Salter has not articulated it, and this Court will not take it upon itself to supplement Salter's approximately 80 pages of briefs, proposed orders, and suggested conclusions of law with a legal predicate that Salter has nowhere articulated therein.  Salter's filings proceed solely on a theory that the information requests discriminate against noncommercial speech, in violation of Salter's First Amendment rights; therefore, it is that theory and that theory alone that the Court considers in adjudicating Salter's Motion.  Whether the information requests were "bogus" or otherwise unjustifiable has no obvious relationship to Salter's claim that the City discriminatorily asked questions of noncommercial permit applicants that it did not ask of commercial off-premises permit applicants.  If noncommercial speakers were treated less favorably, then the restriction is content-based.  Perhaps Salter meant to emphasize the allegedly "bogus" character of the information requests to establish that the City could not meet the strict scrutiny test of proving a compelling government interest in the differential treatment.  If that was the theory, though, the Court need not reach it because Salter has failed to demonstrate that the information requests amounted to a content-based speech restriction, as would be necessary to trigger a strict-scrutiny analysis.

to equal protection and that any delays in processing those application were Salter's own fault. (Docs. 52, 53.)   Salter counters that summary judgment is unwarranted on each ground.

> **A.     Standing.**

The City first seeks summary judgment on the premise that Salter "lacks standing to challenge any provisions of Brewton's Sign Ordinance beyond § 10.775 (which regulates both damaged signs and new sign applications)."   (Doc. 53, at 12.)   In so arguing, the City relies on the standing analysis applied by this Court last April at the preliminary injunction stage.   At that time, the undersigned followed a line of recent billboard cases in which the Eleventh Circuit has repeatedly "deemed the injury complained of not to be redressible for standing purposes because even if the plaintiff succeeded in showing the objected-to provisions of the Ordinance to be unconstitutional, some other provision would preclude it from being able to erect billboards." *Bill Salter Advertising, Inc. v. City of Brewton, Ala.*, 486 F. Supp.2d 1314, 1336 (S.D. Ala. 2007).   Applying this standard, the Court reasoned that, even if Salter could prevail on the merits of its objections to the Ordinance's exemptions, the unbridled discretion it purportedly confers upon decisionmakers, and the alleged want of procedural safeguards, "Salter would remain unable to erect new off-premises billboards in the City of Brewton because it has not shown a substantial likelihood of success on its claim that the prohibition on new off-premises billboards is unconstitutional."   *Id.* at 1338.   On that basis, the Court opined that it would appear not to make a whit of difference to Salter whether the Ordinance is or is not constitutional with respect to its exemptions, the degree of discretion it conferred, and the scope of its procedural safeguards.   Either way, Salter would remain barred from erecting the desired billboards pursuant to the Ordinance's unequivocal prohibition on off-premises advertising signs.   The City's position is that this line of reasoning sweeps away all of Salter's ancillary challenges to the Ordinance not concerning the rebuilding of damaged signs or the construction of new off-premises signs.

To rebut this argument, Salter maintains that the standing analysis is different now than it was in April 2007.   Unlike the July 2006 applications that were being litigated at the time of the order on motion for preliminary injunction, Salter asserts, the May 2007 applications are not subject to denial under the Ordinance's prohibition on new off-premises signs because those applications were for noncommercial (and therefore on-premises) signs.   *See Coral Springs*

*Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1344 (11th Cir. 2004) ("according to the law of this Circuit, noncommercial messages are by definition onsite signs").  Given that the off-premises sign ban poses no obstacle to these applications, Salter maintains that it has standing to challenge procedural aspects of the Ordinance relating to the City's handling of the May 2007 applications because those provisions are the cause of its injury in fact (*i.e.*, the City's prolonged delay in processing the billboard applications and Salter's accompanying loss of revenue while its applications hung in limbo).  On that basis, Salter asserts that it has standing to challenge the following aspects of the Ordinance: (1) Section 10.711, which authorizes the City to request certain information from sign applicants to ensure compliance with the Ordinance; (2) the Ordinance's lack of procedural safeguards "such as a time limit on the initial decision to grant or deny a sign permit"; and (3) the information requests that Salter contends favor commercial over noncommercial speech.  (Doc. 64, at 21-22.)[32]

In response to Salter's argument, the City does not further press the notion that Salter lacks standing to protest either the alleged lack of procedural safeguards or the alleged discrimination against noncommercial speech; rather, it apparently concedes that Salter can show the requisite injury in fact to pursue both such claims herein.  But the City does maintain that standing is absent with respect to § 10.711, and that invalidation of that provision of the

---

[32]     Here again it becomes evident that the legal issues joined in this case are in a state of flux.  Salter does not identify which portions of its First Amended Complaint purport to challenge § 10.711 of the Ordinance.  To be sure, Count Three alleges that the Ordinance "fails to contain the minimum procedural safeguards," that it "grants City officials virtually unfettered discretion in determining whether a sign will or will not be permitted," and "impermissibly favors commercial speech over noncommercial speech."  (Doc. 40, ¶¶ 64-66.)  But the First Amended Complaint says nothing about § 10.711 or the constitutionality of Ordinance provisions pertaining to information requests; rather, this challenge appears to have been engrafted onto this action for the first time during the course of summary judgment briefing.  Perhaps Salter would link § 10.711 to the pleadings as the vehicle through which City officials are granted "virtually unfettered discretion" in granting or denying applications.  Such a linkage is questionable at best; however, the City has not objected to injection of a new issue in this case via summary judgment briefing.  As such, the § 10.711 claim will be recognized as if it had been properly pleaded.  *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003) ("issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties"); *Carter v. University of South Alabama Children's & Women's Hosp.*, 510 F. Supp.2d 596, 600 n.3 (S.D. Ala. 2007) (same); Rule 15(b), Fed.R.Civ.P.

Ordinance "would have no effect" on the information requests made of Salter with respect to the May 2007 sign applications.  (Doc. 66, at 10.)  The Court disagrees.

On its face, § 10.711 explains that one wishing to build a sign in Brewton must obtain a permit from the City building inspector by filing an application, "***together with such drawings and specifications as may be necessary*** to fully advise and acquaint the building inspector with the location, size, construction materials, manner of illuminating, and securing or fastening, and number of signs applied for ***and the wording of the sign or advertisement to be carried on the sign***."  *Id.* (emphasis added).  Thus, this provision appears to vest authority with the building inspector to determine which "drawings and specifications ... may be necessary to fully advise and acquaint" him with the proposed sign, as well as to request specific information concerning the content of the proposed sign.  It appears that the information requests being challenged by Salter were issued pursuant to § 10.711.  If (as the City argues) they were not issued under the auspices of § 10.711, then the City may have a problem of another form because it has identified no other provision of the Ordinance that would confer upon it the authority to promulgate such information requests in processing sign permit applications.[33]  Neither side presents summary judgment evidence concerning the authority for the City's information requests; therefore, the Court cannot determine what the ultimate source of that authority was.  Nonetheless, to the extent that § 10.711 authorized the City's information requests at issue, Salter unquestionably has standing to challenge it because Salter maintains that those information requests are the root cause of the delays that have inflicted the injuries of which Salter complains in this lawsuit.[34]  As

---

[33]     At most, the City states that its request for the flood documentation concerning the Burnt Corn Creek sign application was justified "by FEMA ... [and] by Article IV §B(4)(a) of Appendix B of Brewton's Code of Ordinances (requiring a 'no-rise' certificate in a flood way)."  (Doc. 66, at 10.)  But the City has identified no regulatory source for the remaining information requests that it promulgated to Salter on June 8, 2007.  Based on the materials before the Court in the summary judgment record, § 10.711 appears to be the most probable source of that authority.

[34]     Stated differently, to the extent that the City's information requests were issued pursuant to § 10.711 (a determination that the Court cannot make on the record before it at this time), if Salter were to succeed in invalidating § 10.711 it would also invalidate the information requests and pave the way for the immediate issuance of the permits, thereby alleviating the alleged injury in fact sustained by Salter.  That is sufficient to establish standing.

such, the City's argument that Salter's challenge to § 10.711 should be dismissed for want of standing is without merit. *See generally City of Trussville*, 458 F.3d at 1267 (sign company has standing to dispute ordinance provision where permit applications were denied, injury was caused by application of that ordinance provision, and the injury can be redressed by the courts).

In light of the foregoing, the City's Motion for Summary Judgment is **denied** insofar as the City contends that Salter lacks standing to challenge the Ordinance (pursuant to Count Three of the First Amended Complaint) for insufficient procedural safeguards (*i.e.*, specific time limits for the decisionmaking process, access to expeditious judicial review), unfettered discretion in information requests promulgated under § 10.711, and discrimination against noncommercial speech in favor of commercial speech.

### B.    *Constitutionality of Prohibition on Off-Premises Signs.*

Next, the City seeks summary judgment on the question of whether the City's prohibition on new off-premises signs (as set forth in § 10.775(7) of the Ordinance) violates Salter's constitutional rights.[35]  The Court examined the constitutionality of § 10.775(7) in some detail in its April 26 Order concerning Salter's Motion for Preliminary Injunction.  At that time, the undersigned declined to adopt Salter's contention that the restriction on "new off-premises signs or billboards" in § 10.775(7) regulates noncommercial speech, reasoning that "plaintiffs in this Circuit have routinely made similar contentions with respect to similar off-premises sign bans. Such arguments have routinely failed." *Bill Salter*, 486 F. Supp.2d at 1330-31.  This

---

[35]    The City does not identify the specific claim or claims of the First Amended Complaint to which this argument relates; however, it appears to embrace elements of both Count Three (captioned "The Sign Ordinance is an Unconstitutional Speech Restriction") and Count Four (captioned "The Sign Ordinance Violates the Fourteenth Amendment to the U.S. Constitution").   For example, Salter rails against § 10.775(7) in Count Three by arguing that the off-premises sign ban "unlawfully restricts both commercial and noncommercial speech, impermissibly favors commercial speech over noncommercial speech, and impermissibly discriminates among both commercial and noncommercial speech in violation of the First Amendment."  (Doc. 40, ¶ 66.)  Similarly, Count Four protests that the Sign Ordinance "has been read by City officials to ban all off-premise signs even though the code plainly allows them in other portions of the text. ... Such provisions are void for vagueness and violate Salter's and others' due process rights."  (*Id.*, ¶ 73.)

determination was based on an unbroken line of unambiguous authority in this Circuit.[36]
Specifically, the Eleventh Circuit has reasoned that a noncommercial sign cannot be an off-premises sign, as a matter of law, because "[a]n idea, unlike a product, may be viewed as located wherever the idea is expressed, *i.e.*, wherever the speaker is located.  Under this alternative view, all noncommercial speech is onsite.  A sign bearing a noncommercial message is onsite wherever the speaker places it."  *Southlake Property Associates, Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114, 1118 (11th Cir. 1997) (footnote omitted).  These principles are, on their face, fatal to Salter's claims that § 10.775(7) should be struck down as an unconstitutional restriction on noncommercial speech, or as a regulation that favors commercial speech over noncommercial speech, because the *Southlake* line of authority holds that bans on off-premises signs do not infringe upon noncommercial signs, which are by definition onsite.

In response to the City's legal arguments concerning the constitutionality of the off-premises ban, Salter is silent.  Indeed, although such claims are recited in the First Amended Complaint, it appears that in the wake of the April 26, 2007 Order, Salter has abandoned its argument that the ban in § 10.775(7) on new off-premises signs is an unconstitutional restriction.[37]  Presumably in recognition of the overwhelmingly unfavorable precedent against it

---

[36]    *See Coral Springs*, 371 F.3d at 1344 ("according to the law of this Circuit, noncommercial messages are by definition onsite signs and therefore certainly not treated unfairly compared with commercial signs" in the context of an off-site ban); *Southlake*, 112 F.3d at 1119 ("The definition of billboard as an offsite advertising sign does not include noncommercial speech as such speech is always onsite."); *Maverick Media Group, Inc. v. Hillsborough County, Fla.*, 508 F. Supp.2d 1126, 1154-55 (M.D. Fla. 2007) ("these provisions of the County's old sign regulations did not favor commercial over non-commercial speech because the prohibitions on off-site signs and billboards did not apply to non-commercial speech"); *Lockridge v. City of Oldsmar, Fla.*, 475 F. Supp.2d 1240, 1254 (M.D. Fla. 2007) (off-site billboard ban "did not favor commercial over noncommercial speech because the prohibitions on billboards did not apply to noncommercial signs"); *Action Outdoor Advertising JV, L.L.C. v. Town of Shalimar, Fla.*, 377 F. Supp.2d 1178, 1193 (N.D. Fla. 2005) (adopting "the Eleventh Circuit's clear instruction that all noncommercial speech is inherently onsite" and finding that restriction on offsite signs "eliminates noncommercial speech from the scope of the definition's reach").

[37]    The City theorizes as much in its reply brief, commenting that Salter "has now abandoned its original claim that the denial of the 9 off-premises signs was unconstitutional." (Doc. 66, at 9.)  Salter has said nothing to suggest otherwise.

on this point, Salter has drastically shifted the focus of this litigation.  Whereas the centerpiece of Salter's claims was once that the City violated its constitutional rights in denying the July 2006 permit applications pursuant to § 10.775(7), Salter now latches onto the May 2007 noncommercial applications and the delay in processing the rebuild applications.  Salter's conspicuous silence on this issue despite its dozens of pages of summary judgment briefs creates the appearance that its previous contention that the City's ban on new off-premises signs violated its constitutional rights is no longer a part of this lawsuit.[38]

Even if no such abandonment occurred, however, this claim is plainly foreclosed by *Southlake* and its progeny.  Accordingly, the City's Rule 56 Motion is due to be, and the same hereby is, **granted** with respect to Salter's claims that the prohibition on new off-premises signs in § 10.775(7) of the Ordinance is unconstitutional, and that the City's denial of the nine July 2006 off-premises billboard permit applications pursuant to § 10.775(7) was unconstitutional.

### C. *The Moratorium.*

Much like Salter, the City seeks summary judgment as to Count One of the First Amended Complaint, in which Salter alleges that its First Amendment rights were violated by enforcement of the moratorium against it for a two-year period.  Also much like Salter, however, the City's Rule 56 Motion on this point relies on the facts in the light most favorable to the movant, and ignores the obvious disputed issues of material fact in the record concerning the existence, nature and extent of the moratorium, as well as its impact (if any) on the timing of the granting of Salter's rebuild applications.

---

[38]    If Salter no longer intended to pursue these claims in the wake of the April 26 Order, the prudent, fair and courteous thing to do would have been for Salter to notify the Court and opposing counsel of that determination.  Such notification would have consumed no more than one sentence of Salter's 30-page opposition brief (doc. 64) or its 80 pages of briefing concerning Salter's own Rule 56 Motion.  By failing to do so, and instead leaving obviously meritless claims in play to be litigated on summary judgment, Salter has created needless work and expense for the City and has squandered scarce resources of this Court.  Rather than providing such notice, Salter faults the City for "choosing ... to focus on Salter's July 2006 off-premise applications."  (Doc. 64, at 20.)  Such criticism is unfounded and unfair.  The City had no choice but to address those July 2006 off-premise applications in detail in its Rule 56 Motion, given Salter's failure to withdraw those claims and their continued nominal presence in this lawsuit.

The linchpin of the City's summary judgment argument on the moratorium issue is its contention that "[t]his moratorium that was passed was (1) limited to 90 days and (2) limited to rebuilding signs and billboards and did not apply to new sign permit applications." (Doc. 53, at 22.) The City further maintains that "[m]ost importantly, ... [Salter] cannot prove that any of the delay in rebuilding the four signs damaged by Hurricane Ivan was prolonged by the moratorium." (*Id.* at 26.) The record evidence taken in the light most favorable to Salter undermines both points. Indeed, Salter's evidence reflects that a 1998 moratorium on sign-building was never repealed, that the City advised Salter as early as fall 2004 (well before the June 2005 moratorium date) that there was no need for Salter to file applications to rebuild the signs because a moratorium was in effect, and that every time Salter spoke with the City about rebuilding the signs between September 2004 and July 2006, the City informed Salter that it could not rebuild the signs because of the moratorium. The record in the light most favorable to Salter shows that the City notified Salter in August 2006 that the moratorium would likewise require the denial of its July 2006 applications to erect nine new billboards in Brewton. To be sure, the City has presented countervailing evidence of its own that, if believed, would effectively rebut Salter's showing. But bedrock summary judgment principles foreclose the Court from making such factual determinations and deciding among competing inferences in the summary judgment movant's favor at this time.[39]

---

[39]     In an attempt to circumvent this defect in its summary judgment motion, the City insists that even if the City had "mistakenly told" Salter that the moratorium was the reason for the delay on the rebuild applications, "such misstatements have no causal connection to the events in this case" because the parties were debating whether the signs were 50% damaged throughout this time period. (Doc. 53, at 26-27.) According to the City, "even had the moratorium never been instituted, the delay in the rebuild/repair of these four signs would have been the same." (*Id.* at 27.) Once again, the City ignores contrary record evidence. If Salter's evidence is accepted by the factfinder, then the City told Salter for two years that it could not rebuild the signs because of a moratorium, and the discussion about whether the signs were more or less than 50% damaged did not even arise until around the time when the July 2006 applications were submitted. In that scenario, the City's statements concerning the moratorium (whether "misstatements" or no) would be directly and exclusively to blame for the lengthy delay in Salter's receiving permission to rebuild the signs. The Court will not accept either party's repeated exhortations in this case to disregard contrary evidence in the record concerning the moratorium to reach an outcome favorable to the movant.

Clearly, then, there are glaring factual disputes on the moratorium issue.  If the finder of fact believes Salter's account, then the City relied on a 1998 moratorium and a June 2005 moratorium to stonewall Salter's efforts to rebuild its signs between September 2004 and July 2006.  Such facts, if proven, would establish that Salter was harmed by a restriction on protected speech that lasted far longer than was reasonably necessary to meet the City's asserted interest in studying the safety aspects of billboard specifications.  The First Amendment demands that, with respect to government regulation of commercial speech, "the extent of the restriction on protected speech [must be] in reasonable proportion to the interests served."  *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).  Because the City has failed to show a legitimate interest in enacting a billboard moratorium for a period of two years (or nine years, in the case of the 1998 moratorium), and because Salter's evidence shows that it sustained a harmful, money-losing two-year delay in the granting of rebuild applications because of that moratorium, the record clearly contains genuine questions of fact as to Salter's right to recover on Count One of the First Amended Complaint.  Accordingly, the City's Motion for Summary Judgment is **denied** insofar as it seeks summary judgment on Salter's § 1983 claims relating to the constitutionality of the moratorium.

> **D.      *Equal Protection Claims.***

Finally, the City requests entry of summary judgment as to Salter's equal protection claims pertaining to the Ordinance and the City's handling of Salter's applications.  In Count Five of the First Amended Complaint, Salter alleges that "[b]y selectively enforcing the Sign Ordinance, the City has impermissibly favored commercial speech over noncommercial speech and the messages of certain groups and organizations over others.  Such favoritism has denied Salter and others equal protection under the law."  (Doc. 40, ¶ 77.)[40]  The equal protection issue appears to be a mere footnote to the parties' exhaustive summary judgment briefing, as the City devotes just two pages to it in its principal brief, and Salter even less.  Indeed, judging by the

---

[40]      Continuing with the theme of fuzzy linkages between summary judgment arguments and particular claims, it appears that Salter's equal protection claim is actually (and confusingly) spread across two causes of action in the First Amended Complaint, namely Counts Four and Five.  This aspect of the City's Motion for Summary Judgment will be construed as applying to both of those causes of action.

dearth of analysis of equal protection principles in both parties' hefty submissions, it does not appear that anyone perceives the equal protection issue to be of substantial import on summary judgment.

That said, the Eleventh Circuit has opined that a defendant local government is entitled to summary judgment on equal protection claims based on selective enforcement of a sign ordinance where a plaintiff billboard company "had not shown that it was similarly situated to other property owners whose variance requests were approved, nor had [it] identified any evidence of discriminatory intent." *Crown Media, LLC v. Gwinnett County, GA*, 380 F.3d 1317, 1323 n.15 (11th Cir. 2004); *see also Maverick Media Group, Inc. v. Hillsborough County, Fla.*, 508 F. Supp.2d 1126, 1156-57 (M.D. Fla. 2007) (dismissing sign company's equal protection challenge to sign ordinance where company failed to show that it was similarly situated to any entity that the county had treated differently under the sign ordinance).

The gravamen of Salter's equal protection claims (to the extent that Salter even intends to pursue them here) is that "[a]s justification for refusing to allow Salter to post the requested noncommercial signs, the City has relied upon certain provisions of the Sign Ordinance that it has not previously enforced, and does not currently enforce, against applicants for signs bearing certain commercial messages." (Doc. 40, ¶ 77.) This claim obviously hinges on the City's information requests in response to the May 2007 noncommercial sign applications. But the record in the light most favorable to Salter reveals no basis for concluding that Salter's May 2007 noncommercial sign applications were similarly situated to those of any commercial applicants. With respect to three categories of the contested information requests (*i.e.*, verification that only noncommercial messages would be posted, submission of a lease agreement specifying that only noncommercial messages would be used, and verification of Salter's authority to submit the sign application), Salter has identified no reason why it would be appropriate for the City to make such requests of commercial enterprises wishing to post on-premises advertising signs. Obviously, the first two requests have no possible application to on-premises commercial signs, such that it would be foolish for Salter even to suggest that such requests should have been enforced as to on-premises commercial sign applicants and noncommercial sign applicants alike. Similarly, an on-premises commercial sign application would ordinarily be made by the property owner himself, and Salter has come forward with no

explanation for why the property owner's authority to submit such application would reasonably be in question so as to warrant such an inquiry there. By contrast, the verification of a noncommercial purpose was warranted in Salter's case to ensure compliance with the off-premises sign ban, and the lease requirements and verification of authority reasonably enabled the City to verify the owner's knowing consent to Salter's plans. Thus, Salter has failed to identify a single commercial sign applicant who is similarly situated to its May 2007 noncommercial applications with respect to these three requirements, and no equal protection claim will lie as to them.

As for the information request concerning flood documentation, Salter has come forward with an array of photographs of commercial signs in Brewton that it contends "exist in the flood plain zone." (Crawley Decl. II (doc. 57, Exh. F), ¶¶ 24-28; doc. 57, Exh. W.) Salter's point is that none of these sign owners were required to submit flood documentation before building those signs, so Salter is being treated differently. But Salter misconstrues the information request at issue. In its final form, the City's information request concerning flood documentation was plainly confined to the Burnt Corn Creek parcel. (Doc. 54, Exh. 22, at 2.) With respect to that parcel, the City apprised Salter on June 8, 2007 that "the property is in a flood way" and that the City's Code of Ordinances "states that hydraulic and hydrologic analyses must be done to show a no rise effect when new construction is in a flood way." (Doc. 54, Exh. 19.) The uncontroverted evidence is that the Burnt Corn Creek parcel lies in a flood way, as opposed to a broader flood zone or flood plain, and that this information request was triggered solely by the flood way status of this parcel. (Yuhasz Aff. II (doc. 63, Exh. 1), ¶¶ 3-9.) Moreover, the City's unchallenged evidence is that neither the commercial signs that Salter rebuilt nor those depicted in Exhibit W to Salter's evidentiary submission are located in a flood way. (*Id.*, ¶¶ 6-7.) Thus, Salter has utterly failed to establish selective enforcement of the flood information request because it has identified no evidence that the City ever allowed a commercial sign to be erected in a flood way without the requested no-rise certificate. No equal protection challenge can attach as to this information request.

Finally, Salter would apparently pursue an equal protection claim based on selective enforcement of the Ordinance's requirement that there be only one on-premises sign per property per street frontage. The City's information requests following the May 2007 sign applications

sought verification of compliance with the one-sign rule as a precondition to issuing the permits. Salter claims this is unfair and discriminatory, and that the City is selectively enforcing the one-sign limitation against its noncommercial signs. To support this contention, Salter offers photographs of locations in Brewton that contain multiple on-premises signs per frontage. (Crawley Decl. II (doc. 57, Exh. F), ¶¶ 20-22; doc. 57, Exh. V.) Yet again, Salter's evidence fails to demonstrate that it sign applications were similarly situated to those in Exhibit V. The City has shown that, while there are properties in Brewton that currently have more than one sign per premises or per street frontage, "[t]hese signs either predate the current Sign Ordinance and were grandfathered in as prior non-conforming signs or are on property which has more than one thousand feet of street frontage, or fit some other exception set forth in the Sign Ordinance." (King Aff. II (doc. 63, Exh. 2), ¶ 5.) Salter has failed to rebut that showing with any evidence that signs depicted in its Exhibit V were subject to the one-sign-per-frontage limitation, or that its May 2007 sign applications were not subject to that limitation. As such, Salter has not satisfied its burden of proffering record evidence that the one-sign rule in the Ordinance is being selectively enforced against its nine May 2007 noncommercial sign applications.

For all of these reasons, the Court finds that the City is entitled to summary judgment with respect to Salter's equal protection claims because Salter has failed to establish that it was similarly situated to other sign applicants as to whom the Ordinance has allegedly been enforced less stringently. The City's Motion is **granted** as to the equal protection claims embedded in Counts Four and Five of the First Amended Complaint.[41]

## VI. Conclusion.

After sifting through the parties' voluminous summary judgment submissions (which

---

[41] As noted *supra*, in briefing Salter's motion for summary judgment, Salter attempted to fashion a previously-unpleaded First Amendment claim arising from these information requests and predicated on a differential-treatment analysis. This issue is functionally equivalent to the equal protection issue, and cannot withstand a summary judgment analysis for the same reasons. Just as Salter has failed to demonstrate that any similarly situated sign applicants were treated differently by the City with respect to the information requests, as required under an equal protection analysis, so too has Salter failed to show that the information requests improperly favored commercial speech over noncommercial speech so as to be subject to a strict scrutiny analysis under the First Amendment. The City is entitled to summary judgment on both theories.

included approximately 170 pages of briefing and well over 400 pages of exhibits), it is abundantly clear what this case is and is not about.  Notwithstanding Salter's assertions to the contrary, it is emphatically not about discrimination against noncommercial speech.  The Ordinance's prohibition on new off-premises billboards did not favor commercial speech over noncommercial speech.  Moreover, the record is devoid of evidence that the City's information requests treated Salter's noncommercial sign applications of May 2007 differently than any similarly situated commercial applicant would be.  What this case is about is whether the City handled Salter's rebuild requests and May 2007 sign applications in a manner that comports with the First Amendment and due process.  There is a jury question as to whether the rebuild requests were delayed for two years because of an excessively protracted sign moratorium. Should the jury find such to be the case, Salter's First Amendment rights would be violated unless the City could satisfy the fourth *Central Hudson* prong to justify a moratorium of such extraordinary duration.  Likewise, triable issues remain concerning Salter's challenges to the Ordinance's want of procedural safeguards (particularly time limits for granting or denying sign applications), the degree of discretion conferred upon City decisionmakers by § 10.711, and the due process ramifications of the City's delays and information requests.[42]

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.     Defendant's Motion to Substitute Exhibit (doc. 65) is **granted**, and plaintiff's objections to same are **overruled**.

2.     Plaintiff's Motion for Partial Summary Judgment (doc. 55) is **denied** in its entirety.

3.     Defendant's Motion for Summary Judgment (doc. 52) is **granted in part**, and

---

[42]     The merits of these issues (*i.e.*, the sufficiency of the Ordinance's procedural safeguards, the § 10.711 discretion, and the due process issue) were not briefed by the parties on summary judgment, even though they appear to be legal issues that may be amenable to resolution as a matter of law.  More importantly, the Court observes that none of these claims are recited as triable issues in the parties' Joint Proposed Pretrial Order (doc. 72) filed on January 16, 2008.  As that document represents the final, binding statement of issues joined in this litigation, it appears that those claims (sufficiency of procedural safeguards, § 10.711 discretion, and due process) are no longer part of this lawsuit, and that the only cause of action remaining for trial concerns is "Whether Salter Suffered any Monetary Damages Due to the City's Utilization of its Allegedly Unconstitutional Moratorium."  (Doc. 72, at 3.)

**denied in part**.  Specifically, the Motion is **granted** with respect to plaintiff's claims that the Ordinance's ban on new off-premises signs is unconstitutional, that the City's information requests in response to the May 2007 applications violate plaintiff's constitutional rights to equal protection, and that the information requests violated the First Amendment by favoring commercial speech over noncommercial speech.  There being no genuine issues of material fact on these claims, Counts Four and Five (and that aspect of Count Three concerning these matters) of the First Amended Complaint are **dismissed with prejudice**.  However, defendant's Motion is **denied** with respect to the constitutionality of the moratorium (Count One), the due process claims (Count Two), and the challenges to the Ordinance as lacking sufficient procedural safeguards and conferring unfettered discretion to the City decisionmakers in requesting information from sign applicants (Count Three).

4.      This action remains set for a Final Pretrial Conference before the undersigned on **January 22, 2008** at **3:00 p.m.**

DONE and ORDERED this 18th day of January, 2008.

s/ WILLIAM H. STEELE                         
UNITED STATES DISTRICT JUDGE